Jacob Chen, Esq.
Dai & Associates, P.C.
1500 Broadway, 2200
New York, NY 10036
(212) 730-8880
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JASON GENTRY

                        Plaintiff,

             -against-

Civil Action No.:
1:17-cv-8654

**COMPLAINT**

GEORGE KALTNER, COMPLAINT DIALER, INC. d/b/a
AVATAR OUTSOURCING; VOICELESS
TECHNOLOGIES, INC.

                        Defendants.

------------------------------------------------------------------------x

      Plaintiff Jason Gentry ("Mr. Gentry"), by and through his attorneys, Dai & Associates, P.C., hereby file this complaint against Defendants George Kaltner, Complaint Dialer, Inc. d/b/a Avatar Outsourcing and Voiceless Technologies, Inc.as follows:

## INTRODUCTION

      1.     The instant action arises from Defendants' wrongful criminal conduct, resulting in an intentional infliction of emotional distress as to Mr. Gentry, wrongful imprisonment, assault and battery, and defamation of Mr. Gentry's reputation and character.

## JURISDICTION AND VENUE

      2.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(3), as the amount in controversy exceeds $75,000 and this is a suit between U.S. citizens of different States and in which citizens or subjects of a foreign state are additional parties.

3. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §§1391(b) and (c), because multiple Defendants reside in this District, and the acts giving rise to the claims herein alleged took place in this District.

## PARTIES

4. Mr. Gentry is a resident of the State of Ohio.

5. Upon information and belief, Complaint Dialer, Inc. d/b/a Avatar Outsourcing, ("Avatar") is a New York corporation located in Mount Vernon, New York.

6. Upon information and belief, Voiceless Technologies, Inc. ("Avatar Philippines") is a subsidiary of Avatar, formerly known as "Avatar Technologies Philippines" and is the successor in interest to Avatar Technologies Philippines. Upon information and believe, Avatar Philippines transacts business in New York State and IloIlo City in the Philippines.

7. Upon information and belief, Defendant George Kaltner ("Kaltner") is the sole officer, and director of both Avatar and Avatar Philippines, the sole owner of Avatar, and the sole *de facto* owner of Avatar Philippines. Upon information and belief, Defendant Kaltner is a resident in Mount Vernon, New York.

## THE FACTS GIVING RISE TO THIS ACTION

**Background**

8. Avatar operates a call center business out of Mount Vernon, New York.

9. Avatar Philippines is an affiliate of Avatar, in that it shares commonality in ownership.

10. Avatar's clients provide Avatar with a database of telephone numbers and a script. Avatar then "outsources" the work to Avatar Philippines, which employs a large staff of English speaking workers and utilizes Avatar's proprietary software for its business.

11. Upon information and belief, Avatar Philippines has no customers other than Avatar and upon information and belief, Avatar does not permit any entity to use its software other than Avatar Philippines.

12. Avatar Philippines and Avatar are alter-egos of one another. Employees of Avatar have been sent in the past to supervise and manage the employees of Avatar Philippines. Avatar Philippines and Avatar have also intermingled funds and on more than one occasion, Avatar has made payments on behalf of Avatar Philippines for the benefit of Avatar Philippines. In fact, in this instant case, as discussed in more detail, funds utilized by Avatar Philippines to engage in illicit activities upon information and belief originated from Avatar. Additionally, both Avatar Philippines and Avatar are wholly owned and dominated by Defendant Kaltner who completely controls both entities and has participated directly in the intermingling of funds and illicit activities. Defendants Avatar Philippines, Avatar, will hereinafter be collectively referred to as "Avatar Defendants".

13. In July 2013, Mr. Gentry was offered a job working for Avatar Defendants as an officer of the company with respect to human resources.

14. Prior to that, Mr. Gentry was working for the United States government as a subcontractor for the State Department, managing and supervising a security detail in Kabul, Afghanistan. In that capacity, he gained tremendous experience with respect to personnel management.

15. Avatar Philippines is located in the city of IloIlo.

16. During Mr. Gentry's tenure, the number of employees of Avatar Philippines exploded from about 200 employees to 1700 employees.

17. The Avatar Defendants were completely dominated by Kaltner. Almost every day, Kaltner would hold a phone conference with the managers and officers of Avatar Philippines,

getting a report as to the status of the company and issuing instructions and directions. On more than one occasion, he traveled to the Philippines to personally oversee the operations of Avatar Philippines and has also in the past directed his personal assistant to the Philippines to act as his eyes and ears.

18. In May of 2014, Mr. Gentry met Ms. Rhea Mee Jardeleza, who later became Mr. Gentry's fiancé and eventually Ms. Gentry. They started dating shortly after they met.

19. Approximately after a year of working at Avatar Philippines, in May of 2014, Avatar Philippines offered him a promotion to the position of "Vice President of Growth and Retention". The official contract was for a three (3) year term with a base annual salary of $18,840, not including bonuses for performance. Before his promotion, Mr. Gentry had been paid on average about $84,000 per year inclusive of bonuses. It was Mr. Gentry's expectation that following his promotion, he would continue to be paid at least that amount if not considerably more and that promotion was a result of his success at managing Avatar Philippines.

20. But in less than two months after Mr. Gentry's execution of the agreement, Avatar Philippines breached said agreement by terminating Mr. Gentry's employment, in July of 2014, with $53,380 in base salary unpaid, and all bonuses unpaid.

21. Following the termination of employment, in July 2014, Mr. Gentry was forced to return to the United States and to the State of Ohio.

22. Despite that, he continued to be in regular contact with Ms. Jardeleza and the two continued their relationship, albeit at a distance.

**Tortious Conduct by Defendants**

23. A year later, in April 2015, Mr. Gentry was contacted by Mr. Brian Fife, someone he had met originally in the Philippines while Mr. Gentry was working for the Avatar Defendants.

Mr. Fife wanted to partner with Mr. Gentry to open up a call center called Integricall Inc. ("Integricall"). Mr. Fife knew that Mr. Gentry had successfully managed Avatar Philippines and advised that he would first loan Mr. Gentry money and if the company proves successful, would be willing to invest a sizeable amount of capital into the company. Mr. Fife also advised that he had a lot of business he could generate for such a call center through his own company.

24. Mr. Fife recommended that the call center be built in the city of Cebu in the Philippines, and Mr. Gentry agreed.

25. Mr. Gentry then invested his own money, roughly $8,000, into the formation of Integricall and in April 2015, traveled to the Philippines to establish oversight of the management of the company.

26. In addition to wanting to own his own company, Mr. Gentry was also motivated to return to the Philippines to continue pursuing his relationship with Ms. Jardeleza.

27. Over the course of the next six months, Mr. Gentry invested a tremendous sum of time and energy into Integricall, helping to find and negotiate a lease agreement, hiring management to oversee the day to day operations, reviewing resumes and interviewing potential employees, and reviewing and examining budgets and the finances of the company.

28. In September 2015, Integricall opened up its office. Initially its sole client was Mr. Fife although both Mr. Fife and Mr. Gentry intended for the company to expand overtime to include other clients.

29. On October 10, 2015, about a month into the operations of the company, Integricall's office was raided by the Philippines National Bureau of Investigation (the "NBI") which is equivalent to the FBI of the United States.

30. The reason for the arrest was in August 2015, Oscar Razzour, the CEO of Avatar

Philippines filed a report with the NBI office in IloIlo against Mr. Gentry. In the complaint, Avatar Defendants allege a "violation of non-disclosure, non-compete" agreement.

31. These allegations are civil in nature and outside the scope of what the NBI, the FBI of the Philippines, has the jurisdiction to investigate. Additionally, the Avatar Defendants materially breached its employment contract with Mr. Gentry, and thus were not entitled to enforce those provisions of the contract.

32. Nevertheless, upon information and belief, through the use of illicit means and fraudulent misrepresentations to a government agency, the Avatar Defendants was able to persuade the NBI to open up an investigation of Mr. Gentry.

33. During the course of investigations, the NBI discovered that Gentry did not have an "Alien Employment Permit", or a "work visa" from the Philippines government.

34. Upon information and belief, while not having an "alien employment permit" prevents Mr. Gentry from "working for" any company in the Philippines, it does not prevent him from owning or investing in one.

35. During Mr. Gentry's time working for Integricall, he did not receive any salary from Integricall and did not violate any provisions of Philippines law.

36. Further upon information and belief, Defendant Kaltner also routinely travels to the Philippines without requesting an "Alien Employment Permit", with all trips to the Philippines being "business" in nature.

37. Upon information and belief, the maximum penalty for violating this provision of law is a fine of up to 10,000 pesos. Or $196.10.

38. On October 14, 2015, the NBI raided the offices of Integricall in force with multiple officers, all with guns drawn, Mr. Gentry was forcibly removed from the premises and all his

personal belongings seized, and then placed in prison.

39. Mr. Gentry remained in prison for six days.

40. While in prison, the holding officers advised Mr. Gentry that the reason he was being detained on what should otherwise be a minor immigration violation was because of sums paid to various government officials.

41. Additionally, one of the officers told Mr. Gentry that the reason they came in with guns drawn was that the Avatar Defendants advised the NBI that Mr. Gentry was a naturally violent individual with military experience and that they should expect him to resist arrest and be prepared to defend themselves.

42. Eventually, after six days in holding, Mr. Gentry was released from holding.

43. After his release, Mr. Gentry continued to live in the Philippines and as best as possible to continued supervision and oversight of Integricall despite the events and disruption that took place in October 2015. However, his efforts were hampered by legal proceedings brought against him at first by the NBI and then by Philippines immigration authorities.

44. Upon information and belief, the Avatar Defendants wrongfully and illegally induced Philippines authorities to aggressive pursue both legal actions for the purpose of forcing Mr. Gentry's deportation and preventing him from being able to ever legally return to the Philippines to ensure that he could not exercise any supervisory authority over Integricall or establish any other call centers in the Philippines.

45. The stress of his living situation and the prospect of deportation had a severe impact on Mr. Gentry's health.

46. In December 2015, Mr. Gentry and Ms. Jardeleza married.

47. In January 2016, Mr. Gentry returned to the United States with Ms. Gentry for

medical treatment in the United States for his tumor which had grown considerably during the stressful conditions that transpired while Mr. Gentry was in the Philippines. The operation was successful and the tumor was removed.

48. In the beginning of January 2016, Mr. Gentry's attorney in the Philippines stated in open court that Mr. Gentry has since married a Philippines national and has a child, during the hearing with respect to his alleged violation of his visa.

49. Upon information and belief, this would entitle Mr. Gentry to certain legal protections and status, meaning that he could work in the Philippines without an alien employment permit.

50. Almost immediately thereafter, a defamatory article was posted on a website called Ripoff Report, the results of which comes up any time Mr. Gentry's name is searched on Google.

51. In that report the writer made a number of false statement of facts concerning Mr. Gentry. It began by accusing Mr. Gentry of stealing "out clients from us" suggesting that the writer is an officer or owner of Avatar and attacking Mr. Gentry on a professional level. It then goes on to accuse Mr. Gentry of having "broken multiple international laws", "facing some jail time because he is committing crimes in other countries" and "using slave labor to feed his drug habit".

52. The writing ends with a specific reference to Mr. Gentry's having married a Filipino woman, something that was only stated in Court a matter of days ago at a proceeding attended by representatives of the Avatar Defendants.

53. Upon information and belief, given the timing of the report and the content of the report, and the fact that said report was targeted specifically at Mr. Gentry and his ability to operate any sort of business, this report was directed against Mr. Gentry by the Avatar Defendants

54. As a result of Defendants' wrongful conduct, Mr. Gentry has returned to the United

States and for the last year has been unable to engage in any enterprising economic venture.

55. As a result of the Ripoff report, Mr. Gentry's reputation has been permanently damaged and he does not believe he will ever be able to find any job or enter into any business arrangement where the other party would run a Google search on Mr. Gentry's name.

56. Additionally, upon information and belief, after Mr. Gentry returned to the United States, the Avatar Defendants were able to persuade the immigration court to place Mr. Gentry on a "blacklist" that would prohibit him from returning to the Philippines.

57. As a result of the October 2015 events and the subsequent blacklist which prevented Mr. Gentry from being able to return to the Philippines, in January 2017, Integricall was shut down and ceased operations.

58. Both legal actions, the one initiated by the NBI and the immigration action, remain ongoing and Mr. Gentry has retained counsel in the Philippines to defend him in both actions.

59. Upon information and belief, the Avatar Defendants are the driving force behind both legal actions and utilized wrongful means to persuade government officials to pursue those actions against Mr. Gentry.

60. As a result of Defendants' conduct, Mr. Gentry has suffered severe emotional distress including depression, and loss of income both with respect to his investments of money and time into Integricall, Inc. and his inability to find well-paying gainful employment in the United States.

**FIRST CAUSE OF ACTION: BREACH OF CONTRACT**

61. Plaintiff repeat and reallege each and every allegation as set forth in above.

62. Plaintiff and Avatar Philippines entered into a contract where Avatar Philippines was to engage Plaintiff for a period of three years for total compensation in the amount of $56,520

and bonuses of an undetermined amount.

63. Defendant Avatar Philippines materially breached the contract when it terminated Mr. Gentry within less than two months after the parties entered into the agreement, leaving at least $53,380 still unpaid.

64. Defendant Avatar Philippines is the successor in interest to Avatar Philippines Inc., the entity which signed the aforementioned contract.

65. Upon information and belief, Defendant Avatar Philippines is wholly controlled and dominated by Avatar and Kaltner.

66. Upon information and belief, Defendant Avatar and Kaltner utilized their domination of Defendant Avatar Philippines to harm Mr. Gentry with respect to the aforementioned breach of contract by wrongfully directing the company to breach the contract, and by undercapitalizing the company.

67. Wherefore as a result Mr. Gentry has been harmed in the amount to be determined at trial.

**SECOND CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

68. Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

69. Defendants conduct in this case include orchestrating the continued criminal prosecution of Mr. Gentry, causing Mr. Gentry to be incarcerated.

70. Upon information and belief, the Avatar Defendants have paid and are continuing to pay bribes to Philippines government officials in order to keep the cases against Mr. Gentry ongoing, and also causing Mr. Gentry to be incarcerated and subject him to continuous legal issues.

71. Additionally, the Avatar Defendants have publicly defaming Mr. Gentry on the

internet such that if anyone searches for his name, they would see the false and malicious accusations of illegal conduct and moral turpitude.

72. Defendants also specifically acted for the malicious purpose of ensuring that Mr. Gentry be unable to find gainful employment.

73. The aforementioned conduct by Defendants is extreme and outrageous in character.

74. Upon information and belief, they were done either with the specific intent of causing Mr. Gentry as much severe emotional distress as possible, or at the very minimum, with disregard for the obvious and substantial probability that it would cause Mr. Gentry severe emotional distress.

75. As a direct result of Defendants' conduct, Mr. Gentry has suffered severe emotional distress to the point where he no longer feels safe traveling to the Philippines among other consequences.

76. Wherefore Mr. Gentry has been damaged in an amount to be determined at trial but of not less than $1 million and is entitled to punitive damages.

**FOURTH CAUSE OF ACTION: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

77. Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

78. Defendants conduct in this case include orchestrating the continued criminal prosecution of Mr. Gentry, causing Mr. Gentry to be incarcerated.

79. Upon information and belief, the Avatar Defendants have paid and are continuing to pay bribes to Philippines government officials in order to keep the cases against Mr. Gentry ongoing, and also causing Mr. Gentry to be incarcerated.

80. Additionally, the Avatar Defendants have publicly defaming Mr. Gentry on the

internet such that if anyone searches for his name, they would see the false and malicious accusations of illegal conduct and moral turpitude.

81. Defendants also specifically acted for the malicious purpose of ensuring that Mr. Gentry be unable to find gainful employment.

82. Upon information and belief, Defendants knew or should have known that their conduct would be likely to cause emotional distress to Mr. Gentry.

83. As a direct result of Defendants' conduct, Mr. Gentry has suffered severe emotional distress.

84. Wherefore Mr. Gentry has been damaged in an amount to be determined at trial but of not less than $1 million and is entitled to punitive damages.

**FIFTH CAUSE OF ACTION: DEFAMTION**

85. Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

86. Upon information and belief, Defendants have posted defamatory and derogatory statements about Mr. Gentry online which has damaged Mr. Gentry's reputation and prevented him from being able to acquire well-paying gainful employment and permanently tarnished his reputation.

87. Wherefore Mr. Gentry has been damaged in an amount to be determined at trial but of not less than $1 million, and is entitled to punitive damages.

**SIXTH CAUSE OF ACTION: DEFAMATION PER SE**

88. Plaintiffs repeat and reallege each and every allegation contained in paragraphs above as if repeated and incorporated herein.

89. Upon information and belief, Defendants have posted defamatory and derogatory statements about Mr. Gentry online which has damaged Mr. Gentry's reputation and prevented him from being able to acquire well-paying gainful employment and permanently tarnished his reputation.

90. Specifically the posted materials state that Mr. Gentry has committed serious, notorious and immoral crimes and was incompetent in his profession.

91. Wherefore Mr. Gentry has been damaged in an amount to be determined at trial but of not less than $1 million and is entitled to punitive damages.

**WHEREFORE**, with respect to each cause of action, Plaintiffs demand judgment as follows:

I. First cause: judgment in the amount to be determined at trial;

II. Second cause: judgment in an amount to be determined at trial of not less than $1 million;

III. Third cause: judgment in an amount to be determined at trial of not less than $1 million;

IV. Fourth cause: judgment in an amount to be determined at trial of not less than $1 million;

V. Fifth cause: judgment in an amount to be determined at trial of not less than $1 million;

VI. Sixth cause: judgment in an amount to be determined at trial of not less than $1 million;

VII. Such other and further relief as the court deems just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
     November     , 2017

Respectfully submitted,
DAI & ASSOCIATES, P.C.

By:   /s/ Jacob Chen
Jacob Chen, Esq.

                Attorneys for Plaintiff
                1500 Broadway, 22nd Floor
                New York, New York  10036
                Ph:  (212) 730-8880
                Fax:  (212) 730-8869
                E-mail: jchen@daiassociates.com