UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JASON GENTRY,

                  Plaintiff,

        v.

GEORGE KALTNER, *et al.*,

               Defendants.

No. 17-CV-8654 (KMK)

OPINION & ORDER

Appearances:

Jacob Y. Chen, Esq.
Dai & Associates, P.C.
New York, NY
*Counsel for Plaintiff*

Joshua M. Lurie, Esq.
Lurie Strupinsky, LLP
Hackensack, NJ

Yevgeny Strupinsky, Esq.
Law Office of Eugene Strupinsky, PLLC
Brooklyn, NY
*Counsels for Defendants*

KENNETH M. KARAS, United States District Judge:

Plaintiff Jason Gentry ("Plaintiff") brings this Action against George Kaltner ("Kaltner"), Complaint Dialer, Inc., d/b/a Avatar Outsourcing ("Avatar"), and Voiceless Technologies, Inc. ("Voiceless" or "Avatar Philippines") (collectively, "Defendants"), alleging violations of 18 U.S.C. §§ 1962(c) and 1962(d) under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* (*See* Am. Compl. (Dkt. No. 32).) Plaintiff also alleges that Defendants committed the state tort of intentional infliction of emotional distress ("IIED"). (*Id.*) Before the Court is Defendants' Motion To Dismiss the Amended Complaint (the "Motion"),

pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Defs.' Not. of Mot. ("Not. of Mot.") (Dkt. No. 45).) For the reasons explained herein, Defendants' Motion is denied without prejudice to renewal after jurisdictional discovery.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Amended Complaint and are taken as true for the purposes of resolving the instant Motion.

Avatar is a New York corporation located in Mount Vernon, New York. (Am. Compl. ¶ 5.) Voiceless is a subsidiary of Avatar and, according to the Amended Complaint, is the successor in interest to Avatar Philippines. (*Id.* ¶ 6.) Also according to the Amended Complaint, Voiceless was formerly known as Avatar Philippines, which is located in IloIlo City in the Philippines and is an affiliate of Avatar because it shares "commonality in ownership." (*Id.* ¶¶ 6, 9, 14.) Avatar Philippines transacts business in New York State and IloIlo City. (*Id.* ¶ 6.) Kaltner is the sole officer and director of Avatar and Avatar Philippines, the sole owner of Avatar, and the "sole de facto owner" of Avatar Philippines. (*Id.* ¶ 7 (italics omitted).) Avatar operates a call center in Mount Vernon, New York that receives phone number databases and scripts from its clients and then outsources the work to Avatar Philippines, which uses Avatar's "proprietary software" and has no clients other than Avatar. (*Id.* ¶¶ 8, 10–11.) Avatar does not allow any entity besides Avatar Philippines to use its software. (*Id.* ¶ 11.)

In July 2013, Plaintiff was offered a job working for Avatar Philippines as a human resources officer. (*Id.* ¶ 12.) Prior to that, Plaintiff worked for the United States Department of State as a subcontractor managing and supervising a security detail in Kabul, Afghanistan. (*Id.* ¶ 13.) During Plaintiff's tenure in the Philippines, the number of employees at Avatar

Philippines grew from approximately 200 to 1,700. (*Id.* ¶ 15.) In May 2014, Plaintiff met and began a romantic relationship with Rhea Mee Jardeleza ("Jardeleza"), who is now married to Plaintiff. (*Id.* ¶ 16.) Also in May 2014, Avatar Philippines offered Plaintiff a promotion to Vice President of Growth and Retention, pursuant to which the Parties entered into a three-year contract (the "Employment Contract"). (*Id.* ¶ 17.) However, in July 2014, Avatar Philippines terminated Plaintiff's employment. (*Id.* ¶ 18.) Following his termination, Plaintiff returned to Ohio, where he is now a resident, and continued his relationship with Jardeleza, who was still in the Philippines at the time. (*Id.* ¶¶ 19–20.)

In April 2015, Plaintiff was contacted by Brian Fife ("Fife"), an individual he met while living in the Philippines, who wanted to partner with Plaintiff to open Integricall Inc. ("Integricall"), a call center in the Philippines. (*Id.* ¶ 21.) Plaintiff invested approximately $8,000 of his own funds to form Integricall, and in April 2015, traveled to the Philippines to "establish oversight of the management of the company." (*Id.* ¶ 23.) Plaintiff assisted in finding and negotiating a lease agreement for Integricall, hiring management to oversee daily operations, reviewing resumes for potential employees, analyzing company statistics, and examining budgets and finances for Integricall. (*Id.* ¶ 25.) Around August 2015, Kaltner learned about Integricall and Plaintiff's involvement in the new company from a former Integricall employee. (*Id.* ¶ 26.) Kaltner then e-mailed Raz Failagao ("Failagao"), an Integricall employee who previously worked for Avatar Philippines, stating, "Don't make me find you Raz," and informing Failagao that if he did not agree to an in-person meeting with Kaltner, Kaltner would "hire a team to find [him in] CEBU." (*Id.* ¶ 27.) Kaltner also wrote, "On your [Facebook,] there was a post that says you are drunk in your apartment[.] [Y]ou took it down[,] but [I] though[t] that was typical Raz[,] so [I] took a screen[shot] of it the other day lol[,] had to send it to Oscar," and, "Good luck

staying out of trouble in all of your endeavors[.] I really mean that, you can't get a law degree with a criminal prosecution in the [United States]." (*Id.*)[1] Failagao refused to attend an in-person meeting with Kaltner. (*Id.* ¶ 29.)

Integricall opened its office in September 2015. (*Id.* ¶ 30.) At the time, Fife was Integricall's only client. (*Id.*) Also in or around September 2015, Defendants paid 400,000 Philippine Pesos ("Php"), approximately $8,500, to Ramilo D. Quinto ("Quinto"), an assistant regional director of the Western Visayas Regional Office of the Philippines National Bureau of Investigation ("NBI"), which is located near Avatar Philippines's office. (*Id.* ¶ 31.) The payment was intended to "induce" NBI to begin investigating Plaintiff and Integricall. (*Id.* ¶ 32.) Kaltner, who Plaintiff alleges was living in Mount Vernon, New York at the time, used "telecommunication systems" while in the United States to instruct that this payment be made. (*Id.* ¶¶ 7, 32.) Avatar then wired the money to Kaltner, who wired it to Razzouk, who gave it to Allain Montilla Francisco ("Francisco"). (*Id.* ¶ 32.) Francisco also goes by the name "Tigby" and is an American "trouble shooter" for Kaltner located in the Philippines. (*Id.* ¶ 31.) Francisco gave the payment to Quinto in person. (*Id.* ¶¶ 31–32.) While still in the United States, Kaltner instructed that a second payment be made to Quinto, again "through the use of telecommunication systems." (*Id.* ¶ 33.) Avatar sent 380,000 Php to Kaltner, who then wired the money from the United States to Razzouk, who gave the money to Francisco, who subsequently paid Quinto. (*Id.*) Finally, and also while in the United States, Kaltner instructed that a third payment be made of 10,000 Php per day to NBI agents. (*Id.* ¶ 34.) This money was intended to cover hotel and travel expenses for the agents, who were located in IloIlo City, so

---

[1] According to Plaintiff, "Raz" referred to Oscar Razzouk ("Razzouk"), who was an executive officer for Defendants and who worked in the Philippines. (Am. Compl. ¶ 28.) The Court assumes that Kaltner's reference to "Oscar" also referred to Razzouk.

4

that they could locate Integricall and Failagao in Cebu.  (*Id.*)  Again, Avatar sent the money to Kaltner, who wired the money from the United States to Razzouk, who gave the money to Jenna Metran ("Metran"), another Avatar employee in the Philippines, who paid the three NBI agents. (*Id.* ¶¶ 34–35.)  The NBI agents were also asked to break into Failagao's residence and steal his laptop, which Avatar and Kaltner thought would have information that could be used to blackmail or intimidate Failagao, or information and documents about Integricall.  (*Id.* ¶ 34.)

On October 10, 2015, the NBI raided Integricall's office.  (*Id.* ¶ 36.)  The raid was due to an August 2015 complaint by Oscar Razzour ("Razzour"), CEO of Avatar Philippines, to the NBI office in IloIlo City alleging that Plaintiff violated the "non-disclosure, non-compete" provision of his Employment Contract.  (*Id.* ¶ 37.)[2]  Plaintiff alleges that although a civil dispute would typically not fall under the purview of the NBI, Defendants "persuade[d] the NBI to open up an investigation" of Plaintiff through "the use of illicit means and fraudulent misrepresentations."  (*Id.* ¶¶ 38–39.)  During the course of the investigation, the NBI discovered that Plaintiff did not have an "Alien Employment Permit," or work visa, from the Philippines government.  (*Id.* ¶ 40.)  Plaintiff alleges that he was not required to have a work visa to invest in and own a company in the Philippines and that Kaltner "routinely travels" to the Philippines for business without a work visa.  (*Id.* ¶¶ 41, 43.)  The maximum penalty for this type of violation was 10,000 Php, or $196.10.  (*Id.* ¶ 44.)

On October 14, 2015, the NBI raided Integricall's office again, this time with guns drawn, and Plaintiff was arrested and placed in prison, where he remained for six days.  (*Id.* ¶¶ 45–46.)  Prior to Plaintiff's detention, a fourth payment of 240,000 Php had been made to

---

[2] Although not clear from the Amended Complaint, the Court assumes that Mr. Razzour and Mr. Razzouk are different persons.

Teadoro Saavedra ("Saavedra"), an NBI officer in Cebu who arrested Plaintiff and who had "discretion and control" over Plaintiff's detention. (*Id.* ¶ 47.) Kaltner instructed that this payment be made through "telecommunications systems" while in the United States, and the money was sent from Avatar to Kaltner, who then wired the money from the United States to Razzouk, who gave the money to Francisco who paid Saavedra. (*Id.*) While Plaintiff was in prison, Saavedra informed him that he was being held because of the money Defendants had paid him. (*Id.* ¶ 48.) Additionally, one of the officers who participated in the Integricall raid informed Plaintiff that officers arrived with guns drawn because Defendants had advised the NBI that Plaintiff "was a naturally violent individual with military experience and that they should expect him to resist arrest and be prepared to defend themselves." (*Id.* ¶ 49.) According to Plaintiff, during his detention, he was not allowed to leave his cell for three days, during which time the NBI agents from IloIlo City were in Cebu. (*Id.* ¶ 50.) After the agents left Cebu, Plaintiff was taken to the prosecutor and was able to post bail, but even after he posted bail, Saavedra refused to release him. (*Id.*) Instead, Saavedra left Cebu for two days, during which time Plaintiff's attorney in the Philippines obtained a court order requiring Plaintiff's release. (*Id.*)

After his release from jail, Plaintiff continued to live in the Philippines and oversee Integricall, while also dealing with the ongoing legal proceedings brought against him by the NBI and, later, the Philippines immigration authorities. (*Id.* ¶ 51.) Three days after his release from prison, Plaintiff received notice of an immigration charge brought against him by the Philippines Bureau of Immigration ("BOI"), accusing Plaintiff of immigration law violations and of being an "alien unfit to remain in the Philippines." (*Id.* ¶¶ 52–53 (quotation marks omitted).) The order sought to permanently ban Plaintiff from returning to the Philippines and, "as

indicated in the BOI's decision," "relied entirely upon" information obtained from and allegations by the NBI's IloIlo City office and the October 2015 Integricall raid. (*Id.* ¶¶ 52–53.) Defendants also sued Failagao, and according to Plaintiff, pursuant to instructions received via "telecommunication" from Kaltner while in the United States, counsel for Defendants attempted to extort Failagao, promising to voluntarily drop a case against him in exchange for false testimony against Plaintiff. (*Id.* ¶ 54.) Failagao refused to testify. (*Id.* ¶ 55.)

In December 2015, Plaintiff married Jardeleza. (*Id.* ¶ 56.) In January 2016, an allegedly "defamatory article" about Plaintiff was published on a website called Ripoff Report. (*Id.* ¶ 57.) Plaintiff alleges that "[u]pon information and belief, given the timing of the report and the contents of the report . . . this report was directed against [Plaintiff] by [Defendants]." (*Id.* ¶ 60.) According to Plaintiff, the article accused Plaintiff of stealing "ou[r] clients from us," and "attack[ed] [Plaintiff] on a professional level," accusing him of having broken international laws, facing jail time because of crimes committed in other countries, and "using slave labor to feed his drug habit." (*Id.* ¶ 58.) The article also mentioned that Plaintiff's wife was Filipino, a fact that had been referenced in court in front of Defendants' representatives only days prior to the article's publication. (*Id.* ¶ 59.) According to Plaintiff, the article comes up as one of the results in a Google search of his name. (*Id.* ¶ 57.)

In February 2016, the BOI issued an order that required Plaintiff to be immediately deported and placed Plaintiff's name on the BOI's "[b]lacklist," which would bar Plaintiff from re-entering the Philippines. (*Id.* ¶ 61.) The BOI's order stated that Plaintiff could apply to be removed from the blacklist five years after his deportation. (*Id.*) On February 26, 2016, Plaintiff returned to the United States for medical treatment for a tumor, which had been exacerbated by the "stressful conditions" brought on by Defendants' alleged conduct. (*Id.* ¶ 62.) Plaintiff

remains in the United States, where he has been "unable to engage in any enterprising economic venture[s]" for the past year. (*Id.* ¶ 63.) Plaintiff claims that because of the article about him, his reputation has been "permanently damaged," and he will be unable to find a job or enter into a "business arrangement" if the other party runs a search for Plaintiff's name on Google. (*Id.* ¶ 64.) Plaintiff asserts that because of the above events, Integricall was forced to shut down in January 2017. (*Id.* ¶ 65.) Legal proceedings brought against Plaintiff by the NBI and BOI are ongoing, and Plaintiff is represented by counsel in the Philippines in both actions. (*Id.* ¶ 66.) Plaintiff asserts that "Defendants are the driving force behind both legal actions and utilized wrongful means to persuade government officials to pursue those actions against [Plaintiff]." (*Id.* ¶ 67.) As a result of Defendants' alleged conduct, Plaintiff "has suffered severe emotional distress[,] including depression[] and loss of income" caused by his investment in Integricall and his inability to find employment in the United States. (*Id.* ¶ 68.)

B.  Procedural Background

Plaintiff filed his initial Complaint on November 7, 2017, which asserted claims for breach of contract, IIED, negligent infliction of emotional distress, defamation, defamation per se, and violations of RICO. (Compl. (Dkt. No. 4).) On March 12, 2018, with leave of the Court, Defendants filed a Motion To Dismiss the Complaint. (Dkt. Nos. 20–21.) Plaintiff filed an Opposition on April 6, 2018, (Dkt. No. 22), and Defendants filed a Reply on April 30, 2018, (Dkt. No. 23). Because Defendants' Reply failed to conform to the page limit set forth in the Court's Individual Practices, the Court rejected the Reply, (Dkt. No. 26), but allowed Defendants to file a conforming Reply, (Dkt. No. 28), which Defendants did on May 4, 2018, (Dkt. No. 29).

On January 23, 2019, the Court heard Oral Argument on Defendants' Motion To Dismiss\. (Dkt. (minute entry for Jan. 23, 2019).) The Court granted Defendants' Motion To

Dismiss without prejudice.  (Dkt. No. 31.)  On February 22, 2019, Plaintiff filed an Amended

Complaint bringing claims under RICO and for IIED.  (*See generally* Am. Compl.)[3]  After

granting Defendants' request for an extension of time to respond to the Amended Complaint,

(Dkt. No. 34), the Court held a Pre-Motion and Status Conference on May 14, 2019, at which the

Court set a briefing schedule for the instant Motion.  (Dkt. (minute entry for May 14, 2019); Dkt.

No. 44.)  On June 14, 2019, Defendants filed the instant Motion.  (Not. of Mot.; Defs.' Mem. of

Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 46); Decl. of George Kaltner in Supp. of Mot.

("Kaltner Decl.") (Dkt. No. 47).)  On July 20, 2019, Plaintiff filed an Opposition.  (Pl.'s Mem. in

Opp'n to Defs.' Mot. ("Pl.'s Mem.") (Dkt. No. 48).)  On August 9, 2019, Defendants filed a

Reply.  (Defs.' Reply in Supp. of Mot. ("Defs.' Reply") (Dkt. No 49).)

## II.  Discussion

### A.  Standards of Review

#### 1.  Rule 12(b)(2)

"[R]esolution of a [Rule 12(b)(2)] motion to dismiss for lack of personal jurisdiction

made in the Southern District of New York requires a two-step analysis."  *See Bank Brussels*

*Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).  "First, the court

must determine if New York law would confer upon its courts the jurisdiction to reach the

defendant," such as under the New York long-arm statute.  *Id.*  Second, if such a basis for

---

[3] Plaintiff also asserts in the Amended Complaint that Defendants' "wrongful criminal conduct further caused violations of state and common law claims including . . . wrongful imprisonment, assault and battery, and defamation of [Plaintiff's] reputation and character." (Am. Compl. ¶ 1.)  However, Plaintiff does not include wrongful imprisonment, assault and battery, or defamation as causes of action in the Amended Complaint; thus, the Court does not address these alleged state law violations here.

jurisdiction exists, the court must then determine whether the extension of jurisdiction is permissible under the Due Process Clause of the Fourteenth Amendment. *See id.*

On a Rule 12(b)(2) motion, the plaintiff has the burden of establishing that the court maintains jurisdiction over the defendant. *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 240 (2d Cir. 1999). However, "[p]rior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing of jurisdiction." *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998) (alteration in original) (citations, italics, and quotation marks omitted); *accord Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "[A] prima facie showing of jurisdiction does not mean that [the] plaintiff must show only some evidence that [the] defendant is subject to jurisdiction; it means that [the] plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction." *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.*, 975 F. Supp. 562, 564 (S.D.N.Y. 1997). A plaintiff may "make this showing through his own affidavits and supporting materials[,] containing an averment of facts that, if credited . . . , would suffice to establish jurisdiction over the defendant." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (alterations in original) (citations and quotation marks omitted). While a court may consider materials beyond the pleadings, the court must credit a plaintiff's allegations in support of jurisdiction. *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." (citations omitted)). Further, "[i]n evaluating whether the requisite showing has been made, [courts] construe the pleadings and any supporting materials in the light most favorable to the plaintiffs."

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) (citation omitted).

### 2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous

11

departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion, the Court is required to "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B. Analysis

Defendants argue that Plaintiff's claims against Voiceless must be dismissed because the Amended Complaint fails to state a claim against Voiceless or, in the alternative, the Court lacks personal jurisdiction over Voiceless. (Defs.' Mem. 2–9.) Defendants further argue that Plaintiff fails to state claims under RICO and for IIED. (*Id.* at 9–18.) Finally, Defendants argue that even if Plaintiff has stated a claim, the Amended Complaint should be dismissed under the doctrine of forum non conveniens. (*Id.* at 18–20.) The Court considers each of these arguments to the extent necessary.

### 1. Materials Considered

As a threshold issue, the Court considers whether exhibits submitted by the Parties in support of and in opposition to the Motion may be considered by the Court at this stage. Defendants filed with their Motion a Declaration by Kaltner ("Kaltner Declaration") and two exhibits. (*See* Kaltner Decl.) One of the exhibits is a copy of the certificates of formation for Avatar Philippines, (*id*. ¶ 8; *id*. Ex. A ("Avatar Philippines Certificates of Formation") (Dkt. No. 47-1)), and the other is a copy of the formation documents for Voiceless, (*id*. ¶ 11; *id.* Ex. B ("Voiceless Formation Documents") (Dkt. No. 47-2)). Defendants submitted the Kaltner Declaration "for the limited purpose of addressing innumerable false statements contained within the Amended Complaint which are being used as a predicate to have th[e] Court assert personal jurisdiction." (*Id*. ¶ 2.) Because "[o]n a Rule 12(b)(2) motion, a defendant may submit affidavits and documents beyond the pleadings," the Court may consider the Kaltner Declaration with respect to Defendants' Motion under Rule 12(b)(2). *Sullivan v. Walker Constr., Inc.*, No. 18-CV-9870, 2019 WL 2008882, at *1 (S.D.N.Y. May 7, 2019) (citing *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). However, with respect to Defendants' Motion under Rule 12(b)(6), the Court must "confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F*., 199 F.3d at 107 (citation and quotation marks omitted). Thus, the Court declines to consider the Kaltner Declaration with respect to Defendants' Motion under Rule 12(b)(6). *See Alston v. 1749-1753 First Ave. Garage Corp*., No. 12-CV-2676, 2013 WL 3340484, at *3 (E.D.N.Y. July 12, 2013)

("It is . . . improper for a court to consider declarations and affidavits on a motion to dismiss." (citation and quotation marks omitted) (collecting cases)).

With respect to the documents attached to the Kaltner Declaration, the Court may take judicial notice of certificates of incorporation and the documents attached to them on a motion to dismiss under Rule 12(b)(6), given that these documents are publicly filed. *See In re Tribune Co. Fraudulent Conveyance Litig*., Nos. 11-MD-2296, 12-CV-2652, 12-CV-6055, 2019 WL 294807, at *21 (S.D.N.Y. Jan. 23, 2019) (considering a corporation's certificate of incorporation at the motion to dismiss stage for a similar reason). Thus, to the extent necessary, the Court will consider the exhibits attached to the Kaltner Declaration here.

Besides a copy of the Amended Complaint, Plaintiff attaches two other documents to his Opposition—Defendants' Pre-Motion Letter, submitted to the Court prior to receiving leave to file the Motion, (Pl.'s Mem. Ex. B ("Defs.' Pre-Motion Letter") (Dkt. No. 48-2)), and an April 30, 1992 article from the Los Angeles Times related to a stabbing by an alleged gang member named Alain Montilla Francisco, (Pl.'s Mem. Ex. C ("Apr. 30, 1992 Article") (Dkt. No. 48-3)). Plaintiff's Memorandum alleges that the individual referenced in the Los Angeles Times Article is the same Alain Montilla Francisco referenced in Plaintiff's Amended Complaint. (Pl.'s Mem. 6–7.) Defendants argue that Plaintiff's submission of the "unauthenticated [article]" is in violation of Federal Rules of Evidence 403, 609, and 801, and that the article is irrelevant, prejudicial, and improper. (Defs.' Reply 5.) Although the Court may take judicial notice of the publication of a news article on a motion to dismiss, its consideration must be limited to the "*fact* that press coverage . . . contained certain information, without regard to the truth of [its] contents." *Staehr v. Hartford Fin. Servs. Grp., Inc*., 547 F.3d 406, 425 (2d Cir. 2008) (emphasis in original) (citations omitted). Further, the article, which relates to events that took place over

20 years before the allegations in the Amended Complaint, is of little relevance to the instant

Motion, even if the Alain Montilla Francisco mentioned in the article is the same individual

discussed in Plaintiff's Amended Complaint, which is an inference the Court will not make.

Thus, the Court will not consider the Los Angeles Times article herein.[4]

### 2.  Personal Jurisdiction

Before reaching the merits of any claims, a federal court must first determine "that it has

jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties

(personal jurisdiction)."  *Majid v. DOVA Med. Ctr.*, No. 13-CV-2958, 2013 WL 3766559, at *1

(E.D.N.Y. July 11, 2013) (quotation marks omitted) (quoting *Sinochem Int'l Co. Ltd. v. Malaysia*

*Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007)).  Thus, "[c]ourts typically consider a defendant's

jurisdictional motions before considering any other type of motions."  *Metro-Goldwyn-Mayer*

*Studios Inc. v. Canal+ Distrib. S.A.S.*, No. 07-CV-2918, 2010 WL 537583, at *5 (S.D.N.Y. Feb.

9, 2010) (citation omitted).  In doing so, the Court has "considerable procedural leeway" and

may "determine the motion on the basis of affidavits alone[,] . . . may permit discovery in aid of

the motion[,] or . . . may conduct an evidentiary hearing on the merits of the motion."  *Id.* at *5

(footnote and quotation marks omitted) (quoting *Marine Midland Bank*, 664 F.2d at 904).  Thus,

the Court first considers Defendants' argument that the Court lacks personal jurisdiction over

Voiceless because, inter alia, Plaintiff has "manufacture[d] facts in order to attempt to have the

Court exercise personal jurisdiction."  (Defs.' Mem. 7–9; *see generally* Kaltner Decl.)  Plaintiff

---

[4] Defendants further request that the Court "strike this portion of the [M]otion, seal it
accordingly, and issue other such sanctions as deemed just and reasonable."  (Defs.' Reply 5.)
The Court will not do so here, where the document at issue is publicly available and does not
appear to contain confidential information, but does note that Plaintiff's inclusion of the article
with his Opposition, and his reason for including it, is improper and irrelevant, particularly on a
motion to dismiss.

responds that Voiceless is the successor in interest to Avatar Technologies Philippines and, as such, the Court has personal jurisdiction over it. (Pl.'s Mem. 1–3.) Plaintiff further argues that under Federal Rule of Civil Procedure 4(k)(2), the "total contacts" of Voiceless with "the United States as a whole are sufficient to confer jurisdiction," and, to the extent necessary, jurisdictional discovery is warranted to determine the sufficiency of these contacts. (*Id.* at 3.)

"It is well settled that when a person is found to be a successor in interest to a person over whom the court has personal jurisdiction, the court gains personal jurisdiction over the successor simply as a consequence of their status as a successor in interest." *McDonald v. N.Y. Reg'l Rail Corp.*, No. 05-CV-3521, 2015 WL 2091841, at *2 (E.D.N.Y Apr. 30, 2015) (citation, alterations, and quotation marks omitted); *see also R.C.M. Exec. Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 635 (S.D.N.Y. 1995) (applying the principle of successor liability to RICO claims). Thus, a successor in interest may be found liable for the actions of its predecessor "without regard to whether [the successor] had any other minimum contacts with the state." *LiButti v. United States*, 178 F.3d 114, 123–24 (2d Cir. 1999) (collecting cases). However, this rule "only applies *after* successor liability is established." *McDonald*, 2015 WL 2091841, at *2 (emphasis in original) (citing *LiButti*, 178 F.3d at 124–25). "To state a claim based on successor liability, a plaintiff must plead enough facts for the [c]ourt to infer that one of the exceptions to the general rule finding that a business entity acquiring the assets from another business generally results in no successor liability." *Martin Hilti Family Tr. v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 430, 456 (S.D.N.Y. 2015) (citations and quotation marks omitted).

Here, Plaintiff alleges only that Voiceless is a successor in interest to Avatar Technologies Philippines, and that "Avatar Philippines," the term by which Plaintiff refers to Voiceless throughout the Amended Complaint, transacts business in both New York State and

IloIlo City.  (Am. Compl. ¶ 6.)  However, Plaintiff does not set forth any facts in the Amended Complaint that would allow the Court to determine whether successor liability does, in fact, apply to Voiceless, which renders the Amended Complaint "woefully deficient in arguing successor liability."  *R.C.M. Exec. Gallery Corp.*, 901 F. Supp. at 638; *see also Leon v. Shmukler*, 992 F. Supp. 2d 179, 191 (E.D.N.Y. 2014) (finding that "bare factual allegations" that one party was another entity's successor and assignee because of the transfer of certain assets were "completely underdeveloped" and insufficient to establish personal jurisdiction under a theory of successor liability).  Indeed, cases that have applied successor liability have involved complaints alleging far more detail about the entities or individuals in question.  *See, e.g.*, *Arabi v. Javaherian*, No. 13-CV-456, 2014 WL 3892098, at *8 (E.D.N.Y. May 1, 2014) (finding that the plaintiff established a prima facie case of personal jurisdiction under successor liability when the plaintiff alleged, inter alia, that the management, personnel, customers, trade suppliers, and physical location of the predecessor and successor entities were the same); *Phillips v. Reed Grp.*, 955 F. Supp. 2d 201, 230–31 (S.D.N.Y. 2013) (noting that the complaint alleged specific facts related to the dissolution of the predecessor entity and the formation of its successor in interest, and that the plaintiff submitted additional evidence related to successor liability in opposition to a motion to dismiss for lack of personal jurisdiction).[5]  To controvert Plaintiff's assertion,

---

[5] Plaintiff also argues that the Court has personal jurisdiction over Voiceless under Rule 4(k)(2) because the case arises under federal law, Voiceless "lacks sufficient contact with any single state to subject it to personal jurisdiction," and Voiceless has "sufficient aggregate contacts with the United States to comport with constitutional notions of due process."  (Pl.'s Mem. 2–3 (quoting *United States v. Int'l Bhd. of Teamsters*, 945 F. Supp. 609, 617 (S.D.N.Y. 1996)).)  According to Plaintiff, because Defendants have previously represented that Voiceless works "through an exclusive vendor service agreement with an entity in Puerto Rico," Voiceless has total contacts sufficient for personal jurisdiction under Rule 4(k)(2).  (*Id.* at 3 (quotation marks omitted).)  Plaintiff also suggests that were Defendants to argue that the dealings of Voiceless through Puerto Rico are insufficient, jurisdictional discovery would be proper.  (*Id.*)

Defendants submit the Kaltner Declaration, which states that Voiceless is "not a successor or a formerly known as entity of Avatar in the Philippines," and that both entities existed at the same time. (Kaltner Decl. ¶¶ 9–10.)[6] However, this statement is not definitive, particularly at the motion to dismiss stage where there has been no relevant discovery and the Court must construe "all factual inferences in [Plaintiff's] favor." *Daventree Ltd.*, 349 F. Supp. 2d at 757 (citations omitted). Instead, facts alleged in the Kaltner Declaration create an issue of fact that is more appropriately resolved through jurisdictional discovery. *Id.* at 743 (denying a defendant's motion to dismiss without prejudice to renewal after the close of jurisdictional discovery because

---

Although the Court need not reach this issue now, the Court notes that Rule 4(k)(2) "operates only when jurisdiction is not available in any state." *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 86 F. Supp. 2d 137, 141 (E.D.N.Y. 2000). Plaintiff has not addressed the threshold issue of whether jurisdiction is available over Voiceless in New York, which is governed by New York's long-arm statute. *See Daventree Ltd. v. Republic of Azer.*, 349 F. Supp. 2d 736, 757–58 (S.D.N.Y. 2004). Only if personal jurisdiction was lacking on this basis would the Court engage in a Rule 4(k)(2) analysis to "examine the extent of . . . [D]efendants' contacts with the United States as a whole to determine whether the exercise of personal jurisdiction comports with the requirements of the Due Process clause of the Fifth Amendment . . . ." *Id.* at 758 (citation omitted); *Cordice v. LIAT Airlines*, No. 14-CV-2924, 2015 WL 5579868, at *5 (E.D.N.Y. Sept. 22, 2015) (determining that the defendant's contacts with the United States were not so "continuous and systematic as to render [the defendant] essentially at home in the United States" (quotation marks omitted) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 138–39 (2014))). Here, Plaintiff's fairly sparse allegations regarding the aggregate contacts of Voiceless with the United States may be insufficient to establish jurisdiction under Rule 4(k)(2), but the Court need not, and does not, reach this question here.

[6] The Court notes that in a separate proceeding brought by Kaltner, Voiceless, and Avatar before this Court, Kaltner has asserted that Voiceless is, in fact, a successor in interest. This fact appeared in Kaltner's original Complaint and Amended Complaint in *Kaltner v. Stewart*, No. 16-CV-9337, but was later removed from the same paragraph in the Second Amended Complaint, which was filed six days after the Motion in this Action. (*See* Compl. ¶¶ 41, 46 ("[Avatar Technologies, Phl., Inc.,] began formally winding down business operations as did [Avatar Technologies, Inc.]. . . . Voiceless . . . through agreements with [Avatar Outsourcing, Inc.] as well as through transferences from [Avatar Technologies, Phl., Inc.,] . . . began activities as the primary user of the Avatar Software as a successor in interest."); Am. Compl. ¶¶ 50, 55 (same); Second Am. Compl. ¶¶ 71, 76 (stating the same, but removing the reference to Voiceless as successor in interest) (Dkt. Nos. 2, 30, 139, Case No. 16-CV-9337).)

of an "issue of jurisdictional fact"); *Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.*, 975 F. Supp. 483, 487 (W.D.N.Y. 1997) (allowing limited jurisdictional discovery on the issue of successor liability when relevant facts were in dispute).[7]

Also in dispute is the issue of which law should apply to the issue of successor liability, which governs what facts must be alleged. Plaintiff cites to New York law in its Memorandum, (Pl.'s Mem. 2), but Defendants appear to suggest that the "laws of the citizen" should apply, (Defs.' Reply 2 n.2). Although the Court need not determine which law applies at this juncture, the Court notes that in a federal question action where the Court exercises supplemental jurisdiction over state claims, the choice-of-law rules of the forum state apply. *Martin Hilti Family Tr.*, 137 F. Supp. 3d at 456. As New York is the forum state, "the first step in a choice[-]of[-]law analysis is to determine whether an actual conflict exists between the laws of the

---

[7] Defendants fail to otherwise address Plaintiff's argument regarding successor liability and personal jurisdiction in their Reply, instead referring to successor liability only in the context of whether Plaintiff has stated a claim. (Defs.' Mem. 2.) With respect to personal jurisdiction, Defendants argue that Puerto Rico is the "appropriate venue." (*Id.*) This argument makes little sense in this context, as "[t]he question of personal jurisdiction . . . goes to the [C]ourt's power to exercise control over the parties," while the question of venue "is primarily a matter of choosing a convenient forum." *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979). Thus, Defendants' position regarding venue is not relevant to Plaintiff's arguments on personal jurisdiction.

Defendants also argue that Plaintiff must meet two jurisdictional tests. (Defs.' Mem. 8–9.) First, Defendants argue that Plaintiff has not satisfied the "effects test," because all conduct by Voiceless took place in the Philippines. (*Id.* at 8.) However, to the extent that successor liability applies, Plaintiff would not need to establish any U.S.-based contacts by Voiceless. *See LiButti*, 178 F.3d at 123–24 (stating that successor liability applies "without regard to whether [the successor] had any other minimum contacts with the state" (collecting cases)). Further, although Defendants argue that Plaintiff must make certain allegations to survive a motion to dismiss based on personal jurisdiction in a case involving an alleged conspiracy, Plaintiff does not seek to argue that personal jurisdiction exists on a conspiracy-based theory, unlike the plaintiff in the case cited by Defendants. (Defs.' Mem. 8–9.) *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86–87 (2d Cir. 2018) (noting that the plaintiff specifically argued that certain defendants were subject to personal jurisdiction as members of a conspiracy). Thus, this standard does not currently apply to this case.

jurisdictions involved." *Id.* at 456 (quotation marks omitted) (quoting *Forest Park Pictures v. Universal Tel. Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012)). Where such a conflict exists, "New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Id.* (quotation marks omitted) (quoting *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)). Thus, if Defendants believe that the principles of Filipino successor law should apply, (*see* Defs.' Reply 2 n.2), Defendants should set forth that standard for the Court in a future Motion. Additionally, though it does not appear to be disputed by Defendants, (*see* Defs' Mem. 7–9; Defs.' Reply 2–3), in order to have personal jurisdiction over Voiceless as a successor in interest, the Court must also have personal jurisdiction over Avatar Technologies Philippines, the original entity. To the extent that Defendants seek to claim otherwise, they must specifically argue this point in a future Motion.

The Court finds that limited jurisdictional discovery is warranted on the issue of whether Voiceless is a successor in interest to Avatar Technologies Philippines. Even though there are "serious questions" as to whether Plaintiff alleges sufficient facts to make out a prima facie case for personal jurisdiction over Voiceless, "the Court has discretion to order . . . discovery on the jurisdictional issue, provided that [] [P]laintiff makes a threshold showing of jurisdiction and establishes that its position is not frivolous." *Unique Indus., Inc. v. Sui & Sons Int'l Trading Corp.*, No. 05-CV-2744, 2007 WL 3378256, at *6–7 (S.D.N.Y. Nov. 9, 2007) (citation, alterations, and quotation marks omitted). In other words, Plaintiff may be permitted to conduct jurisdictional discovery if it has "at the very least . . . made a sufficient start" towards establishing personal jurisdiction. *BHP Trading (UK) Ltd. v. Deep Sea Int'l Shipping Co.*, No. 90-CV-2231, 1991 WL 198747, at *5 (S.D.N.Y. Sept. 23, 1991); *see also Perkins v. Sunbelt Rentals, Inc.*, No. 14-CV-1378, 2015 WL 12748009, at *4 (N.D.N.Y. Aug. 13, 2015) (stating

that it is appropriate to grant jurisdictional discovery when a plaintiff's allegations are "simply insufficiently developed at [the] time to permit judgment" on personal jurisdiction (citation, alteration, and quotation marks omitted)). Here, where Plaintiff has alleged that Voiceless is a successor in interest, (Am. Compl. ¶ 6), and certain facts with respect to this status are in dispute, (Kaltner Decl. ¶ 9), limited jurisdictional discovery is appropriate. *See Daventree Ltd.*, 349 F. Supp. 2d at 761 ("If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction[al] discovery is appropriate even in the absence of a prima facie showing as to the existence of jurisdiction." (citation and italics omitted)). Additionally, while the Court does not suggest that counsel for Defendants has been untruthful, "it nonetheless remains the case that Defendant[s] [may] ha[ve] made inconsistent statements about" the status of Voiceless as a successor in interest. *Unique Indus., Inc.*, 2007 WL 3378256, at *7. Accordingly, Plaintiff may conduct jurisdictional discovery regarding the status of Voiceless as a successor in interest within 60 days of the date of this Opinion and Order.

## III. Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is denied without prejudice. Within 30 days of the jurisdictional discovery deadline, Defendants may renew their Motion To Dismiss. Plaintiff will have 14 days to respond, and Defendants may reply seven days thereafter.

The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 45).

SO ORDERED.

DATED:      March 25, 2020
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE